**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

In re                                    :        Chapter 11

DIOMED INC. *et al.*                     :        CASE NO. 08-40749-JBR

DEBTORS                                  :
_____

**MEMORANDUM OF DECISION ON APPLICATION OF ENDOLASER ASSOCIATES, L.L.C. FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO 11 U.S.C. §§ 503(a), 503(b) AND 507(a)(2)**

This matter came before the Court for hearing on the Application of Endolaser Associates, L.L.C. for Allowance of Administrative Expense Claim pursuant to 11 U.S.C. §§ 503(a), 503(b) and 507(a)(2) [docket # 328] and the objections of the Debtors [docket # 356] and Creditors' Committee [docket # 357].  Endolaser asserts an administrative claim of approximately $2.33 million while the Debtors and Creditors' Committee disagree as to the amount, and with respect to most of the claim, the classification of the claim as administrative.  Upon consideration of the arguments raised by the parties at the hearing and in their pleadings[1] and for the reasons set forth herein, the Application is allowed in part and denied in part.  A portion of the claim, namely that arising from rejection of the License Agreement, may be allowed as a general unsecured claim if Endolaser is able to establish that such claim is part of the rejection damages.  The amount of the claim, both the administrative expense and the unsecured portions, will be determined at a later evidentiary hearing if the parties are unable to resolve that dispute.

_____

[1]Prior to the hearing, Endolaser filed a Response to the Objection [docket #384] followed by a Supplemental Response [docket #400] filed after the hearing.  The Debtors and Creditors' Committee then submitted a Post-Hearing Memorandum and Response to Endolaser's Supplemental Response [docket # 410].

**FACTS**

The facts are not in dispute but, as far as the Court can determine, present a

scenario caused by the intersection of bankruptcy and patent law not addressed in any

published decision.  In July 2003 the Debtor, Diomed, Inc., entered into a license

agreement with Endolaser whereby Diomed received an exclusive license, including the

sole right to issue sublicenses, of Endolaser's undivided interest in U.S. Patent No.

6,398,777 (the "777 Patent"),[2] which is used in the manufacturing of products for

endovenous laser treatment of varicose veins, in exchange for a lump sum payment

and the obligation to make periodic royalty payments.  *See* License Agreement at ¶ 5.

Diomed was to use "commercially reasonable efforts to actively market and sell

Licensed Products...."  *See* License Agreement at ¶ 3.1.  The License Agreement also

conferred on Diomed the sole right to enforce the 777 Patent, including discretion

whether to bring infringement actions and the right to settle such actions.  *See* License

Agreement at ¶ 4.6.   Diomed subsequently purchased the remaining undivided interest

in the 777 Patent from its holder, Dr. Robert Min.[3]  In 2004 Diomed sued

---

[2]The inventors named in the 777 Patent included Doctors Luis Navarro, Lester
Navarro, Carlos Bone Salat, Joaquina Fructuoso Gomez, and Robert J. Min.  Endolaser
obtained its undivided interest by acquiring the interests of all of the inventors except Dr.
Min.

[3]During the June 2, 2008 hearing, Diomed's attorneys referred to the fact that
Diomed purchased the Min interest in the 777 Patent before it entered into the License
Agreement with Endolaser.  *See* Transcript of June 2, 2008 hearing (docket # 322)
(hereinafter cited as "Tr.") at page 14, lines 13-18, and page 24, line 24 through page
25, line 1.  As Endolaser acknowledges in its Application and as the documents
indicate, the Min interest was obtained by a purchase agreement dated July 23, 2003
while the License Agreement is dated July 11, 2003.  This troubling discrepancy is not
relevant to the Court's decision.

AngioDynamics, Inc. ("Angio") and Vascular Solutions, Inc. ("VSI") for infringement of

the 777 Patent in the United States District Court for the District of Massachusetts and

obtained jury verdicts of $9.71 million and $4.975 against Angio and VSI respectively.

Angio and VSI were also permanently enjoined from infringing on the 777 Patent.  Angio

and VSI both appealed.  On March 14, 2008 (the "Petition Date"), approximately one

month before oral arguments were to be heard in the appeal, Diomed and Diomed

Holdings, Inc. (the "Debtors") filed voluntary petitions for reorganization pursuant to

Chapter 11 of the United States Bankruptcy Code.

Shortly after the Petition Date Diomed filed a Motion to Approve Compromise

with Angio (docket # 67), which was approved, without objection, on April 2, 2008.

Under the compromise the judgment against Angio was reduced to $7 million and Angio

dismissed its appeal.  On April 8, 2008 Diomed filed a Motion to Approve Compromise

with VSI (docket # 137), which was approved, without objection, on April 16, 2008.

Pursuant to the VSI compromise the judgment against VSI was reduced to $3,586,478

and the remainder of the appeal was dismissed.  The permanent injunction prohibiting

Angio and VSI from infringing on the 777 Patent remained in effect after the

compromises, however.

The License Agreement provides that Endolaser shall share in the settlement

proceeds.  Specifically the License Agreement calls for Endolaser to receive 25% of the

settlement proceeds minus all Patent Litigation Costs and applicable Interest Factors,

both as defined in the License Agreement.  *See* License Agreement at ¶ 5.  Diomed has

not tendered and Endolaser has not received any portion of the settlement proceeds.

On April 9, 2008 the Debtors filed a Motion to Sell (docket # 149), which

3

proposed to sell substantially all of the Debtors' assets to Angio.  Among the items that

Angio  was to receive was

> [a]n agreement executed by Sellers in form and substance
> reasonably satisfactory to the parties: (i) granting Buyer the
> right of first refusal with respect to the sale of the 777 Patent
> and the exclusive license with respect thereto; (ii) a release
> and agreement not to sue or otherwise file legal actions
> against Buyer for infringement of the 777 Patent, which shall
> be binding upon the Sellers' successors and assigns; and
> (iii) releasing the injunction imposed against Buyer in the
> District Court of Massachusetts relating to litigation between
> Buyers and Sellers over the 777 Patent....

Asset Purchase Agreement, dated April 9, 2008 (the "APA") at Section 3.2(k).

Endolaser objected (docket # 269 and # 288) on the grounds that the APA, especially

Section 3.2(k) was a thinly disguised attempt to transfer ownership and control of the

exclusive license of the 777 Patent to Angio without assuming and assigning the

License Agreement.[4]  At the first hearing on the Motion to Sell, held on May 28, 2008,

the Court agreed and advised the parties it would not approve the sale as contemplated

but urged the parties to resolve the dispute.  When the parties were unable to reach a

resolution, the Debtors and Angio filed an amendment to Section 3.2(k) of the Asset

Purchase Agreement (docket # 292) whereby the sale was restructured to provide

Angio with "a non-exclusive, worldwide, perpetual, fully paid-up, royalty free license

under Diomed's undivided ownership interest in the 777 Patent and all foreign

counterparts...."  Amended Section 3.2(k) also required the Debtors to cooperate with

Angio "in all actions deemed reasonably necessary" by Angio  to vacate the permanent

---

[4]Although the cost of curing the defaults under the License Agreement was not
quantified, the parties appear to agree that the cost would be "significant."  *See*
Emergency Motion to Reject License Agreement at ¶ 13.

injunction.  At the same time the Debtors filed an emergency motion to reject the

License Agreement (docket #290) "in conjunction with the sale" of their assets.[5]  Both

motions were allowed on June 2, 2008 with some modifications, including the deletion of

the word "worldwide" from amended Section 3.2(k).[6]  At the express request of

Endolaser,[7] to which the Debtors and Angio acquiesced, the Motion to Reject License

Agreement was allowed and became effective *before* the sale was consummated.

Endolaser also agreed not to oppose the dissolution of the permanent injunction as to

Angio and expressly reserved its rights to assert its monetary claims under the License

Agreement before this Court.

## ENDOLASER'S ADMINISTRATIVE CLAIM

Endolaser now seeks allowance and payment of an administrative claim, which

consists of four separate components.  First, Endolaser seeks an administrative claim

for royalties for the use of the 777 Patent in products that were sold postpetition but

prior to the rejection of the License Agreement (the "Prerejection Royalty Claim").

Second, Endolaser alleges an administrative claim for royalties for the bulk sale of

products using the 777 Patent, which were sold to Angio as part of the sale of

substantially all of the Debtors' assets (the "Bulk Inventory Royalty Claim").  Third,

Endolaser seeks administrative treatment for its claim to a portion of the net settlement

---

[5]Other than this simple statement, the motion does not address the timing of the
two events in relation to each other.

[6]Clean and blacklined copies of the orders approving the sale and rejection of the
License Agreement appear on the docket at # 298 and # 299 (the sale order) and # 300
and #301 (the rejection order).

[7]*See* Tr. at page 35, line 25 through page 36, line 3 and page 42, lines 12-17.

proceeds derived from the Angio and VSI settlements (the "Settlement Proceeds

Claim").  Finally, Endolaser alleges an administrative claim for damages it avers

resulted from Diomed's agreement to cooperate with Angio in having the permanent

injunction released (the "Permanent Injunction Release Claim").

**DISCUSSION**

Endolaser asserts a claim pursuant to 11 U.S.C. §§ 503(a),[8] 503(b)(1)(A), and

507(a)(2).[9]  It is the application of § 503(b) that determines whether Endolaser has an

administrative claim.  That section provides in pertinent part:

> After notice and a hearing, there shall be allowed
> administrative expenses, other than claims allowed under
> section 502(f) of this title, including--
> (1)(A) the actual, necessary costs and expenses of preserving the
> estate....

As the party asserting the administrative claim, Endolaser bears the burden of

satisfying each element of § 503(a)(2)(B) by a preponderance of the evidence.  *Woburn*

*Assoc. v. Kahn (In re Hemingway Transport, Inc.*), 954 F.2d 1, 5 (1st Cir. 1992).  Citing

to the pre-Bankruptcy Code case of *Cramer v. Mammoth Mart, Inc. (In re Mammoth*

*Mart, Inc.)*, 536 F.2d 950 (1st Cir. 1976), the *Hemingway* court instructed that generally

> a request for priority payment of an administrative expense
> pursuant to Bankruptcy Code § 503(a) may qualify if (1) the
> right to payment arose from a postpetition transaction with

---

[8]Section 503(a) addresses when a request for administrative payment may be made: either "timely" or "tardily... if permitted by the court for cause."  An administrative bar date has not been set and thus the request is timely.

[9]Section 507(a)(2) grants a second priority, behind domestic support orders, to administrative expenses allowed under section 503(b).

the debtor estate, rather than from a prepetition transaction
with the debtor, and (2) the consideration supporting the
right to payment was beneficial to the estate of the debtor.

*Hemingway*, 954 F.2d at 5.  *See also In re PYXSYS*, 288 B.R. 309 (Bankr. D. Mass.

2003).[10]  "The traditional presumption favoring ratable distribution among all holders of

unsecured claims counsels strict construction of the Bankruptcy Code provisions

governing requests for priority payment of administrative expenses."  *Hemingway*, 954

F.2d at 4-5.  Nevertheless, as one of the primary purposes of § 503(b)(1)(A) is to

encourage parties to do business with a debtor in possession or trustee, the "actual,

necessary costs and expenses of preserving the estate" include "the actual and

necessary expenditures of the trustee in operating the business of the estate."  4 L.

KING, COLLIER ON BANKRUPTCY ¶ 503.06, at 503-24.2 15 th Ed. Rev. 1995).

Before turning to Endolaser's claims, the Court notes that some fundamental

---

[10]Based on the Supreme Court decision of *Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759 (1968), the First Circuit has also recognized a "special category" of administrative expense claim based on principles of fundamental fairness.  *Hemingway*, 954 F.2d at 5; *Mammorth Mart*, 536 F.2d at 954.  Traditionally, such administrative expense claims, however, have been applied to torts and speak only to the second prong of the what the *PYXSYS* court referred to as  the *Mammoth Mart/Hemingway* analysis as the special category arises only when the claimants are "injured by the debtor-in-possession's operation of the business even though their claims did not arise from transactions that were necessary to preserve or rehabilitate the estate." *Hemingway*, 954 F.2d at 5(quoting *Mammorth Mart*,  536 F.2d at 954).  *See also Spunt v.Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.)*, 755 F.2d 200 (1st Cir. 1985)(granting administrative status to award of damages for postpetition breach of injunction aimed at preventing a nuisance); *Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp.*, 443 F.2d 867, 874 (2d Cir.1971)(terminating a temporary injunction against debtor's use of patent and noting patentee would have administrative claim if debtor's postpetition use subsequently determined to be an infringement).  Endolaser has not alleged it is seeking administrative status under the "special circumstances"standard.  Nevertheless, as dealt with herein, it advocates that fairness mandates allowance of its claim as administrative.

tenets of patent law are central to its analysis of whether each of the four components of

Endolaser's claim satisfies § 503(b)(1)(A).  When multiple inventors are named as the

inventors of a patent, each co-owner presumptively owns a pro rata undivided interest in

the entire patent, no matter how great or small his individual contribution to the

invention.  *Israel Bio-Engineering Project v. Amgen, Inc.*, 475 F.3d 1256, 1263 (Fed. Cir.

2007).  With co-ownership comes the power to use the patent in its entirety, even if the

circumstances suggest that the use results in the abuse of the rights of the remaining

co-owners.

The rights of co-owners of a patent stem from 35 U.S.C.A. § 262, which provides:

> In the absence of any agreement to the contrary, each of the
> joint owners of a patent may make, use, offer to sell, or sell the
> patented invention within the United States, or import the
> patented invention into the United States, *without the*
> *consent of and without accounting to the other owners.*
> (Emphasis added).

*See also Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412

F.3d 215, 236 (1st Cir. 2005), *cert. denied* 547 U.S. 1147, 126 S.Ct. 2296 (2006)

quoting CORPUS JURIS 2D PATENTS § 315 ("[I]n the absence of any agreement to the

contrary, each of the joint owners of a patent may make, use, offer to sell, or sell the

patented invention ... *unless such profits accrue after a joint owner has procured an*

*assignment of his coowner's interest to himself by fraud.*"); *Gibbs v. Emerson Elec. Mfg.*

*Co.*, 29 F. Supp. 810, 811 -12 (D.C.MO. 1939) quoting 48 CORPUS JURIS § 365 ("The

use of a patent right is different from the use of any other property, and in determining

the rights, powers, and liabilities of coowners of patents it is not safe to follow the rules

adopted in regard to coowners of ordinary chattels. The nature of a patent is such that

joint owners in it are at the mercy of each other.  In the absence of a special agreement,

each co-owner may manufacture, use, and sell the patented invention with or without

the consent of his coowner, no matter how small his interest may be, without liability to

account for his individual use of the invention, and without being liable to account for

profits, unless such profits accrue after a joint owner has procured an assignment of his

coowner's interest to himself by fraud.").  When there is no agreement to the contrary,

each co-owner "may use the whole of the invention as he wishes, or he may grant a

non-exclusive license to outsiders to use it, and may then retain the proceeds and

profits thereof."  *Milgram v. Jiffy Equipment Co.,* 362 Mo. 1194, 1200, 247 S.W.2d 668,

673 (1952).

 With these principles as the framework for its analysis, the Court must examine

each of the four components of Endolaser's claim.

1.  The Prerejection Royalty Claim

The parties agree that this component of the claim is entitled to administrative

treatment.[11]  The only dispute is the amount of the royalty payments outstanding.  The

Court has ordered the parties to file a written status report regarding their efforts to

---

[11]At oral argument the Debtor stated that administrative treatment for this portion
of the claim may not be appropriate under *Mammoth Mart*.  The Court disagrees and
concludes this portion of the claim is what can be described as a "classic" administrative
claim.  *See In re Beverage Canners Int'l Corp.*, 255 B.R. 89 (Bankr. S.D.Fla. 2000)
(granting administrative status to a trademark licensor whose mark was used
postpetition despite the fact that the licence agreement was prepetition).

resolve what appears to be little more than an arithmetic calculation.[12]  In the event that

the parties are unable to reach a resolution, the Court will schedule a further hearing.

    2.  <u>The Bulk Inventory Royalty Claim</u>

    The parties disagree whether the sale of inventory as part of the sale of

substantially all of the Debtors' assets triggers a royalty claim that should be afforded

administrative treatment.  Quite simply Endolaser alleges that it is entitled to an

administrative claim because the sale of this inventory occurred postpetition and

generated approximately $1.5 million of the purchase price for the estates.  This

position assumes that the bulk sale necessarily occurred pursuant to the License

Agreement, a scenario that is factually inaccurate.  Moreover, Endolaser's Response

proclaims "it is beyond good faith debate that the only reason why the License

Agreement was rejected immediately prior to the sale, [sic] was to prevent Diomed from

selling exclusive rights in the '777 Patent without compensating Endolaser as required

by the Bankruptcy Code."  Of course this statement ignores that it was Endolaser who

insisted on the timing of the rejection.  Nor can Endolaser's argument that it is unfair for

the Debtors to have used its license to negotiate the sale carry the day.  The special

circumstances exception to the general rule regarding administrative claims does not

_____

    [12]Diomed has not presented any evidence that the measure of the value received
by its postpetition, prerejection use of the license was anything other than the value
ascribed to the license in the License Agreement, namely the royalty payments.
"Presumptively, the value of consideration received under an executory contract is the
amount set forth in such contract. ...The basis for such a presumption is that the parties
are in the best position to negotiate the terms and value of the consideration. It logically
follows that if a debtor makes full use of the services provided under a contract, the
benefit to the debtor is the entire bargained for value pursuant to such agreement."
*Beverage Canners,* 255 B.R. at 93 (internal citations omitted).

10

actually *create* the claim.

> If there is such a thing as a fundamental fairness doctrine in
> bankruptcy, it is pertinent to the determination of the request
> that a claim be afforded administrative priority; it has nothing
> to do with the validity of the claim itself. The estate's liability
> cannot be based on any such doctrine, but only on some
> violation of a legal duty imposed by the bankruptcy code or
> non-bankruptcy law....

*In re Sheridan,* 174 B.R. 763, 767 (Bankr. N.D.Ill.1994), *aff'd* 187 B.R. 611 (N.D.Ill.

1995).

The Debtors argue that, at best, the claim is unsecured as the sale occurred after

the License Agreement was rejected but they assert that the correct treatment for the

Bulk Inventory Claim is to deny it in its entirety as sale of the 777 Patent inventory was

permissible under Diomed's ownership of its undivided interest in the 777 Patent.

Because co-owners of patents may license the patent without accounting to the other

co-owners for the profits, they argue Endolaser is not entitled to any claim, much less

an administrative one.

Prior to rejection of the License Agreement, Diomed and Endolaser had modified

their rights under 35 U.S.C.A. § 262; they agreed that only Diomed would use, market,

and sublicense the 777 Patent and in exchange, Diomed agreed to make royalty

payments based on products sold.  That landscape changed and changed dramatically

when the License Agreement was rejected, even if said rejection only took place

immediately before the sale.

Rejection of an executory contract is "[o]ne of the most powerful tools in the

chapter 11 debtor-in-possession's bankruptcy tool kit."  *In re Dehon*, 352 B.R. 546, 558

(Bankr. D. Mass. 2006).  "Rejection does not constitute a termination of the contract....

11

It does not cause a contract to magically vanish. Rather, the Debtor's rejection of the lease of the Property constitutes a breach of the lease as of the petition date." *In re The Ground Round, Inc.*, 335 B.R. 253, 261 (1st Cir. B.A.P. 2005), *aff'd* 482 F.3d 15 (1st Cir. 2007). *See* 11 U.S.C. § 502(g). Once rejection occurred, however, Diomed's right to the continued use of the exclusive license ended. *Ground Round, Inc.*, 482 F.3d at 18. Upon rejection, Diomed could no longer sell inventory using Endolaser's license but, because of the machinations of patent law, it did not need Endolaser's license. Its co-ownership was enough.

That the results of rejecting an executory contract can be onerous does not permit this Court to ignore § 365.

> Congress has plainly provided for the rejection of executory contracts, notwithstanding the obvious adverse consequences for contracting parties thereby made inevitable. Awareness by Congress of those consequences is indeed specifically reflected in the special treatment accorded to union members under collective bargaining contracts, *see Bildisco*, 465 U.S. at ----, 104 S.Ct. at 1193-96,[13] and to lessees of real property, *see* 11 U.S.C. § 365(h). But no comparable special treatment is provided for technology licensees such as Lubrizol. They share the general hazards created by § 365 for all business entities dealing with potential bankrupts in the respects at issue here.

*Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1048 (4th Cir. 1985), *cert. denied* 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed2d 592 (1986).[14]   Free

---

[13]*N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 104 S.Ct. 1188 (1984).

[14]*Lubrizol's* holding was superceded by the enactment of 11 U.S.C. § 365(n), which gives special protection to licensees of intellectual property rights when the debtor is the licensor. The enactment of § 365(n) does not detract from the *Lubrizol* court's analysis.

from its obligations under the contract, Diomed could use, market, and/or sublicense, albeit on a non-exclusive basis, the technology without accounting for, or remitting to Endolaser, any profits.  Although the bulk sale of inventory occurred post-petition and indeed the inventory itself was manufactured while the License Agreement was still in effect, the triggering event for the payment of royalties, namely the actual sale of the inventory,[15] occurred after the agreement was rejected.  It occurred  pursuant to Diomed's co-ownership rights as set forth in 35 U.S.C.A. § 262; Diomed did not need nor did it use any portion of the License Agreement or Endolaser's rights to accomplish the bulk sale.  Therefore Endolaser's Bulk Inventory Royalty Claim must be denied administrative status.  Endolaser, however, may assert the royalties as part of its unsecured claim for damages arising from the rejection of the License Agreement. Whether the royalties can be allowed as part of Endolaser's rejection claim is left for another day.[16]

3. The Settlement Proceeds Claim

Endolaser seeks administrative treatment for its claim to 25% of the net settlement proceeds on the ground that the claim to the proceeds arose postpetition, namely when the Court approved the compromises with Angio and VSI.  It argues that prior to that point, the judgment could have been reversed on appeal.  The Debtors disagree; they assert that Endolaser's argument that the judgment could have been reversed is simply a way of saying the judgment was contingent claim.  According to the

---

[15]License Agreement at ¶ 5.3; 5.4; 5.5; and 5.6.

[16]Similarly the Court is not ruling whether any unsecured claim asserted by Endolaser would be timely.

Debtors and the Committee, because this claim arose, at the very latest, when judgment entered, the Settlement Proceeds Claim cannot satisfy the *Mammoth Mart/Hemingway* standard; it is  a prepetition general unsecured claim.  As support the Debtors rely on the Bankruptcy Code's definition of "claim."

If the Debtors are correct, then a contingent claim does not metamorphose into an administrative claim simply because it becomes fixed postpetition.  But before concluding whether or not the Settlement Proceeds Claim is a garden variety prepetition contingent claim, the Court must examine both the Bankruptcy Code's definition of "claim" and the unique considerations of patent law.

The term "claim" includes a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured...."  11 U.S.C.A. § 101(5)(A).  If the Court's inquiry began and ended with the definitional section, then the Debtors would be correct in their characterization of the Settlement Proceeds Claim.  But another basic principle of patent law creates a wrinkle.

"It is well settled that, in the absence of an agreement to the contrary, one co-owner of a patent cannot sue a third party for infringement unless all other co-owners of the patent voluntarily join the suit."  *Ethicon, Inc. v. U.S. Surgical Corp.*, 954 F. Supp. 51, 53 (D. Conn. 1997), *aff'd* 135 F.3d 1456 (Fed. Cir. 1998), *cert. denied* 525 U.S. 923, 119 S.Ct 278, 142 L.Ed.2d 229 (1998).  *See Waterman v. Mackenzie,* 138 U.S. 252, 255, 11 S.Ct. 334, 335, 34 L.Ed. 923 (1891).  Chisum, *Patents,* § 21.03[3], 21-295 (2008).  This is frequently expressed by noting that one co-owner, acting alone, lacks standing to bring an infringement action.  "The doctrine of standing limits federal judicial

14

power and has both constitutional and prudential components." *Media Techs. Licensing, LLC v. Upper Deck Co.*, 334 F.3d 1366, 1369 (Fed. Cir. 2003).

> [T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized,... and (b) actual or imminent, not conjectural or hypothetical, .... Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.... Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Id.,* at 38, 43, 96 S.Ct., at 1924, 1926.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-561, 112 S.Ct. 2130, 2136 (1992)(internal citations and quotation marks omitted).  Clearly Diomed had constitutional standing at every stage without regard to whether or not Endolaser joined in the litigation.  But the prudential consideration for standing requires further investigation.

*Waterman v. Mackenzie,* 138 U.S. 252, 255 (1891), is frequently cited as the origin for the prudential doctrine of standing in patent infringement cases.  In *Waterman,* the Court stated, among other things, that all patent owners have standing to sue for patent infringement.  Subsequently, in *Independent Wireless Telegraph Co. v. Radio Corporation of America,* 269 U.S. 459, 468, 46 S.Ct. 166, 169 (U.S. 1926), the Court explained why both the owner and the exclusive licensee of a patent were necessary parties to infringement suits.

> The presence of the owner of the patent as a party is indispensable, not only to give jurisdiction under the patent laws, but also in most cases to enable the alleged infringer to respond in one action to all claims of infringement for his act, and thus either to defeat all claims in the one action, or

15

by satisfying one adverse decree to bar all subsequent actions.

The same rationale holds true when there are multiple owners of a patent.  "Since all co-owners have standing to sue for infringement, if all the co-owners are not joined in an infringement suit, there may be a risk that the defendant will be subject to multiple suits." *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.,* 944 F.2d 870, 875 (Fed.Cir.1991) (policy underlying requirement of joining owners is to prevent possibility of two suits against a single infringer.)  Therefore it is necessary to protect a defendant from multiple litigations, each commenced by a different co-owner.  When one co-owner sues for patent infringement, the court will find the non-joined co-owner indispensable to protect a defendant from the "justifiable fear that should [it] prevail and the court determine that the patent in suit is either invalid or not infringed, the remaining joint owners might still relitigate these issues at a later date in another costly and vexatious proceeding." *Willingham v. Star Cutter Co.,* 555 F.2d 1340, 1345 (6th Cir. 1977).

Although the Court has not found any cases involving the intersection of the Bankruptcy Code's broad definition of claim and the prudential considerations of standing in patent infringement cases in a scenario comparable to the instant one, the facts, as played out, in the instant case, provide the roadmap for analyzing the priority to be afforded to the Settlement Proceeds Claim.  When the infringement judgments entered against Angio and VSI, the infringement defendants filed a timely appeal.  The judgments, therefore were contingent and would remain so until a final order entered either from a court of last resort or by agreement of the parties.  The parties, that is Diomed and Angio, then Diomed and VSI, stipulated to final resolutions of the monetary judgments.  But Endolaser's ability to enter into a binding stipulation was only possible

16

because of the License Agreement, which expressly provided that Diomed had the sole

right to settle litigation and bind Endolaser to the settlement.  That is precisely what

happened in this case.  Diomed *used* the License Agreement to reach final settlements,

thereby avoiding the possibility that the judgments would be overturned on appeal, and

saving the estate the expense and delay of prosecuting the appeal.  These facts fall

squarely within the  *Mammoth Mart/Hemingway* analysis.

Diomed, however, cites *Schwarz Pharma, Inc. v. Paddock Laboratories, Inc.*,

504 F.3d 1371 (Fed. Cir. 2007), for support that it had standing to maintain the appeal

without Endolaser.  *Schwarz Pharma* is inapposite to the facts at bar.  In *Schwarz*

*Pharma* Schwartz Pharma, the exclusive licensee of a patent owned by Warner-

Lambert, sued Paddock Laboratories for infringement.  Paddock Laboratories joined

Warner-Lambert as a party in the district court litigation.  When the district court entered

a judgment of non-infringement, only Schwartz Pharma appealed.  Paddock

Laboratories moved to dismiss the appeal on the grounds that Schwartz Pharma lacked

standing to prosecute the appeal.  The appellate court disagreed and stated that "when

a patentee joins an exclusive licensee in bringing a patent infringement suit in a district

court, the licensee does not lose standing to appeal even though the patentee does not

join in the appeal."  If read in a vacuum, as Diomed would have the Court do, the

holding indeed seems to support Diomed's position that it could continue the appeal

without Endolaser.  The facts in *Schwartz Pharma* distinguish this case.  First, the

*Schwarz Pharma* court recognized that the prudential doctrine of standing in patent

cases has its underpinnings in the potential threat that an alleged infringer could be

subject to multiple litigations for infringement.  As the district court found there was no

17

infringement and Warner-Lambert failed to appeal, there was no danger that Paddock Laboratories would be subjected to a later suit for infringement by Warner-Lambert. Second, Schwartz Pharma had standing as an exclusive licensee; the exclusive license agreement gave Schwartz Pharma its standing.  To the extent that Diomed had standing to maintain an appeal as an exclusive licensee without joining Endolaser, it is *only* because of the License Agreement.  Diomed needed to use and did use the License Agreement postpetition to derive a benefit to the estate and thus the Settlement Proceeds Claim is entitled to administrative status.

Similarly *Roche Products, Inc. V. Bolar Pharmaceautical Co.*, 733 F.2d 858 (Fed. Cir.), *cert. denied*  469 U.S. 856, 105 S.Ct. 183 (1984)*,* which the Debtors cited at the hearing as support for its position, is readily distinguishable.  After its patent had expired, Roche sued a competitor, who had begun experimental testing of a generic drug before the patent had expired, for infringement.  Therefore the issue before the court was the narrow one of whether such competitor's testing in preparation for the expiration of the patent, was actionable.  Roche was the assignee of the patent rights. Patent rights are freely assignable.  35 U.S.C. § 261 ("patents shall have the attributes of personal property.  Applications for patents, patents, or any interest therein, shall be assignable in law ....").  With Roche, as assignee, holding the full bundle of rights under the patent, there was no other party to be joined as a plaintiff.

4.  The Permanent Injunction Release Claim

11 U.S.C. § 502 (g)(1) provides:

> A claim arising from the rejection, under section 365 of this
> title or under a plan under chapter 9, 11, 12, or 13 of this
> title, of an executory contract or unexpired lease of the

18

> debtor that has not been assumed shall be determined, and
> shall be allowed under subsection (a), (b), or (c) of this
> section or disallowed under subsection (d) or (e) of this
> section, the same as if such claim had arisen before the date
> of the filing of the petition.

Despite the clear language of the statute, Endolaser argues that it is entitled to over $1 million for damages resulting from Diomed's agreement to assist Angio in obtaining the release of the permanent injunction entered against Angio and VSI in the district court litigation.  As a basis for elevating the rejection claim to administrative status, Endolaser asserts that Diomed owed it a fiduciary duty under New York law arising from the covenant of good faith and fair dealing implied in every contract governed by New York law.  Again the Debtors disagree, arguing they do not owe Endolaser a fiduciary duty and asserting that Angio had the right to use the technology once it received a non-exclusive license as part of the sale of the Debtors' assets.  The release of the permanent injunction was superfluous.

The License Agreement is governed by New York law, which imposes a covenant of good faith and fair dealing on all of contracts.  That covenant, however, does not create a fiduciary duty or give rise to a separate cause of action.  *Silvester  v. Time Warner, Inc.,* 1 Misc.3d 250, 258 (Sup.Ct.2003), *aff'd on other grounds ,* 14 AD3d 430 (1st Dept.2005).  *Banco Espanol de Credito v. Security Pacific Nat. Bank,* 763 F.Supp. 36, 44 (S.D.N.Y.,1991), *aff'd* 973 F.2d 51 (2rd Cir. 1992), *cert. denied* 509 U.S. 903, 113 S.Ct. 2992, 125 L.Ed.2d 687 (1993).  Moreover, a fiduciary relationship does not exist absent a "specific relationship of confidence" even if the contract uses the words "agent" and "principal" as the License Agreement does in one paragraph. *Wilhelmina Artist Management, LLC v. Knowles ,*2005 WL 1617178, 9 (N.Y.Sup.)

19

(N.Y.Sup.2005).

> A fiduciary duty arises in situations where one party puts its
> trust and confidence in another because of the other's
> superior knowledge or expertise. The essential feature of a
> fiduciary relationship is reliance by one party on the integrity
> or discretion of another.... A commercial relationship may
> give rise to a fiduciary duty, ... but a fiduciary duty generally
> does not arise out of a contractual relationship between
> parties with comparable bargaining power where the duties
> of the parties are dictated by the terms of the contract.

*Mia Shoes, Inc. v. Republic Factors Corp.*, 1997 WL 525401, *2

(S.D.N.Y.,1997)(internal citations omitted).  There is no suggestion that the parties were

in unequal positions or that the parties intended or anticipated that the License

Agreement would give rise to a fiduciary relationship.  The relationship between Diomed

and Endolaser was simply as arm's length parties to a licensing agreement that

contemplated they would be left to the morals of the marketplace, not a fiduciary

relationship.  "If the parties find themselves or place themselves in the milieu of the

"workaday" mundane marketplace, and if they do not create their own relationship of

higher trust, courts should not ordinarily transport them to the higher realm of

relationship and fashion the stricter duty for them."  *Northeast General Corp. v.*

*Wellington Advertising, Inc.*, 82 N.Y.2d 158, 162, 624 N.E.2d 129, 131, 604 N.Y.S.2d 1,

3 (N.Y.1993).

Similarly Endolaser's claim that "Diomed had an obligation to act in the best

interests of all patent interests, and not solely for the benefit of the interest it owned

outright" and thus had an ongoing responsibility to protect Endolaser's interest by

maintaining the permanent injunction is more verbiage expressing the same thought.

Endolaser suggests that once the injunction was obtained, Diomed was forever bound

to vigilantly preserve it.  Such an argument ignores the fact that, once the License

Agreement was rejected, as was Diomed's right, Diomed was free to grant Angio a

license to the 777 Patent.  That license, without more, is sufficient to permit Angio to

use the technology without fear of future restriction.  *See InternetAd Systems, LLC v.

Opodo Ltd..*  481 F. Supp.2d 596, 607 (N.D.Tex. 2007)(non-exclusive license is a

promise from the licensor not to sue for infringement).

Endolaser's claim that Diomed monopolized the 777 Patent throughout the

bankruptcy until it negotiated a deal with Angio and then rejected the agreement  raises

a bad faith argument.  While bad faith can be the basis for a court refusing to permit

rejection of an executory contract, *In re Logical Software, Inc*., 66 B.R. 683, 686 (Bankr.

D. Mass.1986), the time to have pressed such an objection has passed.  It was at

Endolaser's behest that the License Agreement was rejected prior to the sale.  The

Court has only found one reported case in which bad faith formed the basis for rejection

damages.  In *In re Besade,* 76 B.R. 845, 848 (Bankr. M.D.Fla. 1987), the court

acknowledged that bad faith could form the basis for rejection damages under Florida

law.

> The bad faith standard under Florida law for damages based
> on breach of contract is far different from the bad faith
> standard under bankruptcy law for determining whether a
> case should be dismissed or a motion to reject an executory
> contract denied. *See, e.g., In re Albany Partners, Ltd.,* 749
> F.2d 670 (11th Cir.1984); *In re Waldron,* 785 F.2d 936 (11th
> Cir.1986). Just because debtor did not act in bad faith when
> seeking court authorization under 11 U.S.C. § 365 to reject
> an executory contract does not mean that debtor did not act
> in bad faith under state law for the purposes of determining
> damages for breach of contract.

> In Florida, a bad faith breach is found to exist where the seller has

21

> title and refuses to convey, or disables himself from doing so by
> conveyance to another person. *Wolofsky, supra,* at 615, *quoting
> Key v. Alexander,* 91 Fla. 975, 108 So. 883 (1926).

*Id.* Whether Endolaser can establish a claim for bad faith damages under New York law as part of its rejection claim remains to be determined.

Finally, according to Endolaser, if it had been released from the License Agreement, it would have provided a second source of that technology and having two sources, instead of one, would have caused Angio to pay a lesser price for its non-exclusive license.  Leaving aside that there is no evidentiary support for Endolaser's argument, Endolaser could have sought to compel rejection of the License Agreement at any point during the case.  It did not.  Furthermore, to the extent there could be a sustainable claim arising from Diomed's use and then rejection of the License Agreement, the claim is nothing more than a rejection claim deemed to be the equivalent of a prepetition breach.  There is nothing to suggest that the claim is entitled to anything more than unsecured status.

**CONCLUSION**

For the reasons set forth herein, the Motion will be ALLOWED as to the Prerejection Royalty Claim and the Settlement Proceeds Claim as to administrative status only; and DENIED as to the Bulk Inventory Royalty Claim and Injunctive Release Claim.

A separate order will issue.

Dated: September 15, 2008      _____
                                     Joel B. Rosenthal
                                     United States Bankruptcy Judge